In Re: Increasing Real Property Tax Revenues of Schuylkill County, Pennsylvania, for the Year 1981 etc. Schuylkill County Concerned Citizens et al., Appellants.

Argued November 17, 1982, before Judges Rogers, Williams, Jr. and Craig, sitting as a panel of three.

*Kathleen A. Weeks,* with her *John R. Zonarich, Skarlatos and Zonarich,* for appellant.

*Frederick H. Hobbs,* County Solicitor, for appellee.

Opinion by Judge Craig, December 22, 1982:

The Schuylkill County Concerned Citizens appeal an order of the Court of Common Pleas of Schuylkill County, which granted that fourth class county's board of commissioners special revenue raising relief.

In 1980, the commissioners concluded that at the end of that fiscal year, the county would have un-

funded debt totaling nearly 4 million dollars.[1] Accordingly, they resolved to file petitions in the common pleas court requesting authority: (1) to fund the unfunded debt with general obligation notes under section 510(a) of the Local Government Unit Debt Act,[2] and (2) to increase the real estate tax rate beyond the five percent limitation imposed by section 701(b) of the Fourth to Eighth Class County Assessment Law.[3]

The common pleas court, President Judge Bowe, Judge Heffner, Judge Lavelle, Judge McCloskey and Judge Dolbin, sitting en banc, granted certain citizens, calling themselves the Concerned Citizens, leave to intervene, consolidated the petitions, and conducted lengthy hearings.

At the close of the hearings, the court, recognizing its general authority to deal with the fiscal affairs of local government, see *Lower Nazareth Township Supervisors' Appeal*, 336 Pa. 250, 9 A.2d 545 (1939), held discussions with the commissioners, the intervening individuals (including the Concerned Citizens), and members of the local financial community.

The result of the joint effort was the formulation of an economic plan set forth in a written stipulation, which was signed by the commissioners and one of the intervening citizens (but not by the Concerned Citizens) and presented to the court for approval. Although not binding upon the court or the parties, the stipulation has evidentiary value.

The court, finding that the commissioners had met the statutory burden imposed by the Debt Act and

---

[1] The debt represented an accumulation of current operating expenses incurred during the years 1978, 1979 and 1980.

[2] Act of July 12, 1972, P.L. 781, No. 185, *as amended*, 53 P.S. §6780-210(a).

[3] Act of May 21, 1943, P.L. 571, *as amended*, 72 P.S. §5453.602(b).

the Assessment Law, granted both petitions, and incorporated the written stipulation in its final order, dated January 13, 1981.

The Concerned Citizens filed exceptions, alleging that the commissioners had failed to present evidence: (1) establishing that the four criteria set forth in section 510(a) of the Debt Act had been met, and (2) establishing ''good cause'' to increase the real property tax revenue, as required by section 602 of the Assessment Law. The common pleas court, sitting en banc, then addressed these exceptions in an opinion dated May 18, 1981, concluding that the commissioners had satisfied the requirements of both statutes.

Before discussing the merits of the commissioners' petitions, we must address the Concerned Citizens' assertion that neither the commissioners' resolution, nor the public notice of the court hearings, specified the proposed rate of taxation in dollars and cents for each $100 of assessed value as set forth in section 1770 of the Act of August 9, 1955, P.L. 323, *as amended,* 16 P.S. §1770, which provides, in relevant part:

No tax shall be levied on personal property taxable for county purposes where the rate of taxation thereon is fixed by law other than at the rate so fixed. The county commissioners shall fix, by resolution, the rate of taxation for each year . . . In fixing the rate of taxation, the county commissioners, if the rate is fixed in mills, shall also include in the resolution a statement expressing the rate of taxation in dollars and cents on each $100 of assessed valuation of taxable property. . . .

The Concerned Citizens' procedural challenge is misplaced. The commissioners' resolution of December 9, 1980 did not fix the rate of taxation; it only

determined that the commissioners would petition the court of common pleas.

Furthermore, as to the assertion that the public notice of the court hearings was deficient, the Concerned Citizens have cited no authority indicating that the commissioners' petitions were subject to the notice requirements imposed by Section 1770. In fact, a contrary interpretation is indicated because under section 510(a) of the Debt Act, the common pleas court may grant a local government authority to fund all or part of its unfunded debt, "on such notice to the local government unit and its taxpayers as the court may prescribe. . . ."

Thus, noting the voluminous record incorporating extensive public participation, we now address the allegations regarding the merits of the petitions. In so doing, we are mindful of our Supreme Court's emphasis in *Lower Nazareth Township Supervisors' Appeal,* which involved a taxpayer's petition requesting that the court of common pleas examine the necessity and reasonableness of items in a township budget, that:

> It will be appreciated by anyone called upon to consider this enactment, that the court of the county, familiar with its local affairs, is in far better position than we are to pass upon matters arising under it. The courts are to pass upon the "necessity" for and the "reasonableness" of the items in the budget and the "amount" of the proposed levy. No one can adequately or with certainty do this, who does not know something of local conditions. Appeals in cases of this kind, coming before us, carry a heavy burden to show that the conclusion of the court of first instance was wrong.

*Id.* at 252, 9 A.2d at 546.

## Common Pleas Court's Authorization of Funding of the Unfunded Debt

Section 510(a) empowers a court of common pleas to approve the issuance of bonds or notes to fund unfunded debt[4] if the court, "shall find [1] that such unfunded debt is a lawful obligation of the local government unit, [2] that there has been an unforeseeable decline in revenues, or that taxes levied have not produced the revenues anticipated or that it was not reasonable to foresee such obligation; [3] that paying such debt by curtailing municipal services will be dangerous to the public health, safety or education, and [4] that it is not feasible or not in the public interest to levy additional taxes in the current fiscal year...."

The Concerned Citizens do not dispute that the unfunded debt is a lawful obligation. Furthermore, the court found that the obligations were the result of legal and proper expenses incurred by the county pursuant to budgets adopted by the commissioners.

The Concerned Citizens, however, assert that the commissioners did foresee, or should have foreseen, the decline in revenues. The common pleas court,

---

[4] Unfunded debt is defined in section 209 of the Debt Act, 53 P.S. §6780-209, as

> [O]bligations of the same or one or more prior years incurred for current expenses (including tax anticipation notes), due and owing or judgments against the local government unit entered by a court of competent jurisdiction after adversary proceedings, for the payment of either of which category the taxes and other revenues remaining to be collected in the fiscal year and funds on hand will not be sufficient without a curtailment of municipal services to an extent endangering the health or safety of the public or proper education of school children, and the local government unit either may not legally levy a sufficient tax for the balance of the fiscal year, or a sufficient tax, if legally leviable, would not be in the public interest.

although noting that the commissioners "could have managed and coped with the financial affairs of Schuylkill County in a more prudent manner," concluded that "the primary cause for County's [sic] deficit could not have been foreseen." The court emphasized the revenue shortfalls due to cutbacks in federal and state programs, delays in receipt of reimbursement payments mandated by these same programs, decreases in federal revenue sharing grants, and the problems related to double-digit inflation. The conclusion is reasonable and supported by the record.

Focusing on the third requirement of section 510(a), the Concerned Citizens next assert that the commissioners presented no competent evidence that curtailment of services would be dangerous to the public, health or education. However, the court concluded that the threatened indebtedness, which constituted nearly 25% of the 1981 proposed budget of 16 million dollars, was such that to require its payment in whole or substantial part by the curtailment of services would be dangerous to the public health, safety or education. In so deciding, the court emphasized the extensive reductions noted in the written stipulation, including a reduction in the county's expenditures by at least 7 1/2%,[5] which potentially included the reduction and/or the elimination of existing departments and personnel;[6] the dissolution of the county's transportation authority;[7] the separation of a county nursing facility's financial accounts from general fund accounts;[8] and the establishment of a legal department to replace the more expensive prac-

---

[5] No. 7 of written stipulation.

[6] No. 8 of written stipulation.

[7] No. 9 of written stipulation.

[8] No. 10 of written stipulation.

tice of contracting out legal services to private attorneys.[9] Given these substantial reductions, the court properly could conclude that further reductions beyond the well-balanced stipulated plan would result in undesirable and potentially dangerous consequences to the county's health, safety or educational concerns.

Finally, as to the fourth requirement that the governing body must show that "it was not feasible or in the public interest to levy additional taxes in the current fiscal year," the court emphasized that the total millage required to pay the unfunded debt during 1981 could have exceeded 25.5 mills, which would have exceeded the increased millage rate derived in the stipulated plan by approximately 11 mills. The court concluded that such a drastic tax increase would jeopardize the fiscal stability of the county government by severely damaging the tax base upon which it rested.

Therefore, we conclude that the court of common pleas acted properly in finding that the four criteria expressed in section 510 of the Debt Act were met, and permit the issuance of the notes to fund the unfunded debt.

*Common Pleas Court's Finding of "Good Cause" Authorizing a Tax Increase Above 5%*

Section 602(b) of the Assessment Law provides that a taxing district (other than a school district) cannot raise real estate taxes in one year "more than 105 per centum of the total amount it levied on such properties the preceding year, notwithstanding the increased valuations of such properties under the new assessment system." However, this section also provides:

---

[9] No. 11 of written stipulation.

With the approval of the court of common pleas, upon good cause shown, any such political subdivision may increase the tax rate herein prescribed, notwithstanding the provisions of this subsection.

Section 602(b) provides no definition of "good cause" nor have the parties here been able to cite case authority defining this term.

However, the large deficit facing the county at least in part supports the need for a tax increase. *See, e.g., Southampton Township School Board Petition,* 16 D. & C.2d 454, 462 (1958). Furthermore, in its opinion, the common pleas court, in arriving at its determination that "good cause" existed for removing the section 602(b) limitation, considered several other factors in addition to the size of the total debt, including the substantial decrease in the amount of federal revenue-sharing funds received by the county, the ongoing cash flow problem due primarily to the time lag associated with receipt of certain state and federal reimbursement payments, the reduction in the aggregate amount of these reimbursement revenues, collective bargaining agreements for the organized county employees which resulted in increased expenditures, and the effects of double digit inflation.

Finally, in reviewing the common pleas court's determination that good cause existed to increase the tax rate, we are impressed by that court's commendable effort, including the enlistment of financial experts, to structure a comprehensive and long-term solution to the county's fiscal crises by formulating a well-balanced plan that includes increased borrowing, expenditure reductions and increased taxes.

Accordingly, we affirm the order of the court of common pleas.

ORDER

Now, December 22, 1982, the order of the Court of Common Pleas of Schuylkill County, No. S-1683, 1980, dated January 13, 1981, is hereby affirmed.